OWENS *v.* THE STATE.

1. The law of voluntary manslaughter should not be given in charge to the jury in cases where this grade of homicide is not involved.
2. Where a charge comprehends only a brief summary of the abstract law pertaining to the case, an appropriate written request, submitted in due time, applying the law to the particular facts should not be refused.    But if the main charge fully and fairly submits to the jury the law applicable to the case, a refusal of a special written request to charge is not erroneous.
3. An exception to a charge containing a correct principle of abstract law can not be considered unless the vice or error is specified.

Submitted April 23,— Decided May 10, 1904.

Indictment for murder.    Before Judge Butt.    Stewart superior court.    March 5, 1904.

*G. Y. Harrell* and *B. F. Harrell,* for plaintiff in error.    *J. C. Hart, attorney-general,* and *F. A. Hooper, solicitor-general,* contra.

EVANS, J.    The plaintiff in error, Milton Owens, was tried in the superior court of Stewart county, upon an indictment charging him with the murder of his father, Shep Owens.    The jury returned a verdict of guilty, and the accused made a motion for a new trial, to the overruling of which he excepted.    The evidence upon which the State relied for a conviction was substantially as follows :    The deceased was killed shortly before eleven o'clock at night, and early the next morning his body was found in his yard, some fifteen or twenty steps from the back door of his

house.    There were signs of a considerable scuffle at the place where the body was found, and numerous tracks around it, made by several persons apparently, the ground being wet and sticky and some of the tracks being almost obliterated by others more distinct.    Some twenty-eight cuts, inflicted with a knife or other sharp instrument, were upon the body, one of them being on the right side near the heart, and two in the back.    Four or five of them were of such a character as would likely produce death almost immediately.    The skull of the deceased was crushed in several places, the wounds indicating that he had been struck on the back of the head with some blunt instrument, such as the head of an ax or hatchet.    He had received sixteen blows on the head ; his throat was cut, and he was disemboweled.    In his pocket was a pair of brass knucks, as well as a number of cartridges ; but no knife or other weapon was found lying near his body.    At the time of his death he was in the prime of his life ; was an unusually large man, and was possessed of great physical strength and courage.    There were no wounds on his body such as might have been produced by a pistol.    " One hand was chewed all to pieces— his fingers and thumb."    The accused, who admitted having done the killing, was apparently unhurt, save that he had one finger wrapped up in a rag.    He voluntarily stated, on the day following the night of the homicide, that he was, at the time the difficulty began, sitting in one corner of the house; that " Shep Owens charged in the house, . . and charged at him with a gun in one hand — a rifle in one hand and a knife in the other, and he [the accused] shot him down, and shot him again;" that his father then " got up and came at him again, and he began to cut him."    The accused was asked as to how the wounds on the head of the deceased were inflicted, and replied he had inflicted them with the rifle " when he came out of doors; . . that he ran back in the house and got the rifle; . . that the cutting began in the house, but he hit him out there" in the yard.    The accused subsequently said he did not return to the house and get the rifle " in the corner where his father first set it up when he first came in the house," but " got it on the ground out there where he dropped it."    The person to whom the accused made this statement examined the rifle, but there was no blood upon it, and no sign indicating that it had been used in inflicting the wounds made upon the head of the deceased.

A witness who was introduced by the accused testified that he got from the accused a knife which had blood upon it and was broken, and that he had stated, upon being asked how he broke it, that he "broke it in the fight; . . that was the knife he used in the fight." The witness further testified that another knife was found lying open on the floor in the main room of the house, but that he saw no blood on this knife. There was also evidence, in behalf of the accused, to the following effect: About eight o'clock on the night of the killing, the accused, accompanied by his mother, his sister, and one of his brothers, went to a neighbor's house, and while there something was said as to how the deceased had been mistreating members of his family. The neighbor advised the mother of the accused to go home and "do the best" she could. After having stayed at this neighbor's house an hour or more, she and the other members of her family started home. Shortly after their departure, Shep Owens called and inquired if his family had been there. He spoke of having had some fuss with his wife, and said " he was going to whip [the accused] that night before he slept.". He was armed with a rifle. After having some further conversation with his neighbor, he left, remarking: " Well, me or Milton one will go to hell to-night, or do something." It was then ten o'clock. He did not say "what he was mad at Milton for," but did tell the cause of the trouble between himself and his wife. The accused made a statement to the jury, during the course of which he said: When he and his brother Reece returned from work on the evening of the homicide, his mother complained that her husband had abused and threatened to kill her, and asked the accused to go with her to the neighbor's house above referred to. They went, but after staying there some time decided to go back home. On their arrival they found the deceased was absent. A brother of the accused informed him that his father had left home with his Winchester, saying he was going to kill the accused. The accused then went and got his pistol and sat down in the house. The deceased soon appeared and demanded admission, and the door was opened by a member of the family. As to what then took place, the accused stated: The deceased " came in and come at me with his knife and cut my coat, and I shot at him, and he dropped his gun and grabbed me, and we got to scuffling, and I got my knife and cut him; and

when I found that my knife 'was broken, I didn't know how bad I had cut him, and he threatened to kill me, and I knew if I didn't work to kill him and save myself he would kill me, and I run back and got the Winchester off of the floor and punched him in the· head with it; and what I done I done in self-defense, and there didn't no one else have anything to do with it but me.    I was the first one he started at; he didn't have a chance to start at the others; and I don't want my mother or my brothers either one punished for what I have done in self-defense."    The accused further stated that he got his "finger hurt in the scuffle mighty bad;" that he also got "knocked" on his hand, and that it swelled up, and his wrist swelled up; that he had a swelled place on his knuckles, and a scar on the joint of his wrist; that it was some time after he went back in the house before he had his finger tied up, and that it bled profusely and the blood dropped down on the floor.

1. Only the grades of homicide involved in the case on trial should be given in charge to the jury.    If neither the evidence for the State nor the statement of the defendant, taken separately or conjunctively, present a case of voluntary manslaughter, the judge should not charge on this grade of homicide.    The office of a charge is to illustrate and apply the legal principles applicable to the facts of the case.    From the evidence submitted by the State, a robust man, at his own home, is killed by his son.    The number, character, and location of the wounds, the strength of the deceased, the evidences of a fierce conflict, and the absence of wounds upon the slayer's person would indicate that more than one person participated in the homicide.    However, the defendant assumes the whole responsibility, exonerating his mother and brothers.    There is no suggestion in the State's testimony of the intermediate grade of homicide; the crime of murder was proved. The defendant's statement made out a case of justifiable homicide. He admits that when he was informed that his father left home with his rifle, threatening defendant's life, he armed himself with a pistol and sat down to await the coming of his father; that as soon as the father entered the house, he attacked defendant with a knife, cutting his coat; then defendant fired his pistol, etc.    If the defendant's account of the homicide was true, he was justifiable. He exhibited no display of passion, but calmly prepared himself

for the threatened attack and defended that attack upon himself. He does not in his statement hint at anything authorizing the inference that he was guilty of voluntary manslaughter; and it would have been manifestly unfair to him for the jury, if they believed his statement, to find that he was not justified in doing everything he admits he did.　　There being neither evidence nor anything in the defendant's statement suggesting his guilt of voluntary manslaughter, a written request to charge the law bearing on that grade of homicide was properly refused.

2. The other written requests were fully covered by the charge. The law of justifiable homicide was elaborately discussed by the judge, and the written requests would not have given the same any additional force.　　Where a charge comprehends only a brief summary of the abstract law pertaining to the case, an appropriate written request, submitted in due time, applying the law to the particular facts should be given.　　Roberts v. State, 114 Ga. 450.　　Yet in cases where the law is fully covered by the main charge, and the presentation of the legal principles is adjusted to the facts, a new trial will not be granted solely on this ground. Simmons v. State, 79 Ga. 697 (4); McDuffie v. State, 90 Ga. 786.

3. Exception is taken to the charge of the court on the subjects of confession and justifiable homicide.　　Movant does not point out the defects in these charges.　　They contain correct abstract principles of law, and the duty is upon the movant to specify in such cases the specific vice of the charge.　　Anderson v. Southern Ry. Co., 107 Ga. 501.　　Failing to do this, such grounds of error can not be considered.　　Binion v. Ry. Co., 118 Ga. 282, 284–287.

The evidence fully warranted the verdict; and no reversible error appearing, the judgment overruling the motion for a new trial is　　　　　　　　　　　Affirmed.　All the Justices concur.